IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DWAYNE NEFF,

        Plaintiff,                        No. CIV S-04-0829 GGH

   vs.

JO ANNE B. BARNHART,
Commissioner of
Social Security,

        Defendant.                 <u>ORDER</u>
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). For the reasons that follow, the court denies plaintiff's Motion for Summary Judgment or Remand, and grants the Commissioner's Cross Motion for Summary Judgment. The Clerk is directed to enter judgment for the Commissioner.

\\\\\
\\\\\
\\\\\
\\\\\

1

BACKGROUND

Plaintiff, born August 6, 1959, applied for disability benefits on May 23, 2001. (Tr. at 14, 46.) Plaintiff alleged he was unable to work since May 1, 2001,[1] due to degenerative disc disease, pain, bipolar disorder, weak left arm, back or neck problems, headaches, difficulty maintaining attention, and moodiness.. (Tr. at 41, 46.) In a decision dated September 14, 2002, ALJ Stanley R. Hogg determined that plaintiff was not disabled.[2] The ALJ made the following

---

[1] Because plaintiff has applied only for Supplemental Security Income, he could not receive benefits prior to the first month after the date of his application, June 2001. 20 C.F.R. § 416.335. However, as plaintiff correctly notes, for purposes of computing 12 months or longer of his disability, i.e. date of onset, dates prior to his date of application up to 12 months may well be relevant. Factually, nevertheless, plaintiff has not been consistent with respect to reporting his date of onset. Plaintiff alleges his disability began on January 1, 2001, because that is the date plaintiff stated he stopped working in his disability report. (Tr. at 54.) The date his disability began as stated on his application, however, is May 1, 2001. (Tr. at 46.) In any event, the court has reviewed all records presented, including those that precede both of these dates.

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

    Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
    Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
    Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
    Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

    The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b). Carpal tunnel syndrom and bipolar disorder are determined to be non-severe impairments.

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6. The claimant has the following residual functional capacity: lift and carry 20 pounds occasionally, 10 pounds frequently, no repetitive or prolonged flexion of the neck.

7. The claimant is unable to perform any of his past relevant work (20 CFR § 416.965).

8. The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963).

9. The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).

11. The claimant has the residual functional capacity to perform a slightly restricted range of light work (20 CFR § 416.967). The restriction on repetitive or prolonged flexion of the neck in a fixed position, would not significantly erode jobs in the light category.

12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such

1  jobs include work as a school bus monitor, host or barker.

2  13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

4  14. Alcohol abuse is involved, but is not material.

(Tr. at 22.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Erred in Failing to Find Plaintiff's Bipolar Disorder Was a Severe Impairment; B. Whether the ALJ Erred in not Finding That Plaintiff Needed to Alternate Positions and Sit or Stand at Will; C. Whether the ALJ Failed to Properly Evaluate Plaintiff's Credibility; and D. Whether the ALJ Should Have Obtained Testimony From a Vocational Expert to Determine Plaintiff's Residual Functional Capacity.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

\\\\\

ANALYSIS

    A.  <u>Whether the ALJ Erred in Failing to Find Plaintiff's Bipolar Disorder Was a Severe Impairment</u>

Plaintiff first contends that in considering plaintiff's impairments at step two, the ALJ should have found that plaintiff's bipolar disorder was a severe impairment.

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered." SSR 85-28. The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 107 S. Ct. 2287 (1987). "The step-two inquiry is a de minimis screening device to dispose of groundless claims." <u>Smolen v. Chater,</u> 80 F.3d 1273, 1290 (9th Cir. 1996).

The ALJ only found plaintiff's musculoskeletal complaints to be severe. The ALJ did not find plaintiff's carpal tunnel syndrome or bipolar disorder to be severe. (Tr. at 16.) In regard to plaintiff's mental impairment, he found that it was not severe because it was not expected to last twelve continuous months, it did not significantly limit him from working, and he did not pursue treatment for one year after being given a referral. (Tr. at 19.) After receiving counseling for one year, plaintiff conceded that he had improved, with a better mood and more motivation. (<u>Id.</u>) The ALJ also rejected the opinion of Dr. Crisp in regard to this mental impairment and chose instead to rely on the opinion of Dr. Vander Veer. (<u>Id.</u>)

Plaintiff's treating psychiatrist was Dr. Crisp. He diagnosed plaintiff with Bipolar Disorder. On June 27, 2001, plaintiff's GAF was 65.[3] On July 17, 2001, plaintiff reported he

---

[3] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social,

5

was doing better and sleeping "fairly well most of the time." (Id. at 149.) On September 7, 2001, plaintiff reported that things were going better now, that he was getting better every day. Dr. Crisp noticed that plaintiff appeared depressed and had a constricted affect, but his mood swings were not very severe recently. (Id. at 147.) On October 9, 2001, Dr. Crisp diagnosed plaintiff with Bipolar II disorder and alcohol abuse. (Tr. at 146.) He also stated, "[r]ule out borderline personality disorder. The patient is showing a lot more symptoms of borderline personality and this may be what is going on instead of Bipolar Disorder." (Id.) Plaintiff was taking Prozac and Depakote at the time. (Id.) He reported that he had no plans to hurt himself, although he had previously purposely cut himself. He stated that he saw "light at the end of the tunnel." (Id.) On November 6, 2001, plaintiff reported that he was doing well, his mood was good, and things were looking up. He was also achieving a good response to medication. (Id. at 191.) On December 4, 2001, and January 2, 2002, plaintiff reported the medications were working, and he was friendly and cooperative. He seemed to be open to making changes at this time. (Id. at 189, 190.) Plaintiff reported that his thoughts were much more focused, and he had more motivation. At this time, plaintiff's suicidal thoughts had completely disappeared. (Id.)

On May 21, 2002, Dr. Crisp completed a mental impairment questionnaire, noting his diagnoses of bipolar disorder, chronic mental illness, and substance abuse. Plaintiff's GAF at that time was 65, with a note that his highest GAF in the past year was 65-70. (Tr. at 195.) Dr. Crisp responded "no" to the question of whether plaintiff was a malingerer. (Id. at 196.) Plaintiff's prognosis was fair and expected to last at least twelve months. (Id. at 197.) In assessing plaintiff's ability to work, this psychiatrist estimated that plaintiff would be absent from work more than three times in a month. (Id. at 198.) In regard to functional limitations, he found plaintiff had no restriction in activities of daily living, moderate difficulties in maintaining social functioning, would seldom have deficiencies in concentration, persistence or pace, and

---

occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM IV.

1  would have repeated limitation in episodes of deterioration or decompensation in work settings.
2  (Id. at 199.)

3        This most recent report by Dr. Crisp indicates that plaintiff's GAF of 65 to 70 in
4  the past year with his finding that plaintiff's condition was expected to last twelve months,
5  implies that a prior GAF of 50 was not expected to reoccur, but that plaintiff's condition was
6  permanent and stationary.

7        Furthermore, the ALJ was entitled to rely on the consulting opinion of Dr. Vander
8  Veer instead of Dr. Crisp. This psychiatrist examined plaintiff on August 4, 2001, and had the
9  benefit of his medical records. His opinion was that plaintiff had bipolar disorder, possible
10 personality disorder, and substance abuse in remission. His GAF at that time was 55.[4] Dr.
11 Vander Veer stated that plaintiff had recently come out of a depression in which he was suicidal.
12 His bipolar disorder was improving with treatment. (Id. at 117.) It was not clear whether
13 plaintiff had a mild personality disorder, but such a determination would take further evaluation.
14 This psychiatrist concluded that plaintiff was able to understand and complete simple tasks,
15 complex instructions, and could relate appropriately to coworkers and supervisors. (Id.)

16       Based on these reports, it is understandable that the ALJ discounted Dr. Crisp's
17 opinion in favor of Dr. Vander Veer's statement. The ALJ noted plaintiff's reports to his treating
18 psychiatrist that he felt better, his mood was better, he was more motivated and things were
19 looking up. (Tr. at 19.) The ALJ noted that despite these statements, Dr. Crisp gave the
20 inconsistent opinion that plaintiff would have problems with authority and social interaction at
21 work, and thought plaintiff would have frequent absences. (Id.) This opinion was not consistent
22 with Dr. Crisp's own treatment notes, including findings of a GAF of 65 and only moderate
23 limitations in social interaction and daily activities. (Id.) Furthermore, the higher GAF scores by

---

25    [4] A GAF of 51 to 60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school
26 functioning (e.g. few friends, conflicts with peers or co-workers). DSM-IV.

Dr. Crisp were more recent than the GAF score assigned by Dr. Vander Veer over nine months earlier, showing improvement in plaintiff's functioning. Also supporting this improvement are the Nevada County Mental Health records from June 29, 2000, which reflect a GAF of 43. (Tr. at 157.) Plaintiff's GAF did improve steadily over a couple of years.[5]

        The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[6] Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

        To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record;

---

[5] In order to qualify for SSI disability, plaintiff must be suffering from a condition that had been disabling for 12 months at the time of his application, or expected to last 12 months or longer. Plaintiff contends that his mental problems began in June, 2000, and lasted longer than twelve months, but the records do not support a finding of *disability* for this time period. Whether plaintiff had an intermittent severe-nonsevere impairment is not pertinent. Similarly, whether plaintiff suffered a severe impairment over 12 months prior to his SSI application, or was even considered disabled for a period of time prior to the one year period before his application, while pertinent to an assessment of more recent medical records, is of no legal consequence itself. That is, assume plaintiff was mentally disabled throughout 1999, but he did not file an SSI application until June of 2001. The fact of disability in 1999 itself does not determine whether plaintiff was disabled for a period of time 12 months or longer, commencing 12 months prior to the date of his SSI application; it may, however, among other evidence, be relevant to determine whether plaintiff was in fact disabled from July of 2000 to June of 2001, the period in which plaintiff *must* be found disabled in order to qualify for benefits on the date of his application (unless plaintiff suffered an emergent disability within the 12 month period that is expected to last sufficiently into the future), or at the threshold analysis, whether he had a severe impairment during that time period. The date of application for SSI is critical to the analysis.

[6] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester , 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[7] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

The ALJ gave legitimate reasons to reject Dr. Crisp's opinion regarding plaintiff's functional limitations in favor of his most recent treatment notes. Not only does Dr. Vander Veer's opinion support the ALJ's finding that plaintiff's bipolar disorder was not a severe impairment, but the psychiatric review technique form completed by the DSS examiner support this psychiatrist's opinion. (Tr. at 121.) Although this check marked form is incomplete, the examiner referred instead to his written comment which stated on August 14, 2001 that plaintiff's bipolar disorder was improving with treatment to the extent that it would not be severe by May, 2002. (Id. at 133.)

\\\\\

---

[7] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

9

The ALJ's finding that plaintiff's bipolar disorder is not a severe impairment is supported by the record.

B. <u>Whether the ALJ Erred in not Finding That Plaintiff Needed to Alternate Positions and Sit or Stand at Will</u>

Plaintiff next contends that due to his neck pain, he should have been limited to work that permitted him to alternate sitting, standing and lying down. He claims the ALJ should have considered recent radiological studies which were not considered by Dr. Kimble or the non-examining state agency source. The ALJ in this regard found that plaintiff's stated need to change positions frequently or lie down for two hours a day was not supported by the objective findings. Based on plaintiff's daily activities, the limited severity of pain, and that pain medication relieved the pain, the ALJ found that although plaintiff's movements were limited, they were not limited to the degree alleged. (Tr. at 20.) The ALJ further found that plaintiff's complaints were "somatic." (Id.)

The report upon which the ALJ relied was that of Dr. Kimble, an internist who evaluated plaintiff one time for the Department of Social Services on August 20, 2001, without the benefit of medical records. She diagnosed plaintiff with cervical degenerative disk disease with chronic neck pain and bilateral carpal tunnel syndrome. (Tr. at 136.) Based on plaintiff's back and neck problems, Dr. Kimble would limit plaintiff as follows in this regard:

> I would preclude him from sustained upward or downward gazing, i.e. greater than 20 minute intervals. He should be precluded from repetitive forceful use of his upper extremities. I would limit his lifting to 20 pounds and should comprise less than a third of the work day. Repetitive reaching activities would likely be poorly tolerated. He would have no specific limitations in his ability to sit, stand, or walk.

(Id.)

The lack of limitations on sitting, standing or walking was based on her exam indicating decreased range of motion in the neck, lateral bending at 40 degrees, compared with normal of 45 degrees, flexion of 40 degrees with normal at 45 degrees, rotation at 45 degrees out

10

of 80 degrees at normal, full range of motion of the back, negative straight leg raising test, full range of motion in the shoulders, and full range of motion of the hips and knees. (Id.)

Various radiological studies date from 1997. On September 19, 1997, an x-ray of the cervical spine indicated a degenerative change at C5-6 and C6-7 with disc narrowing and osteophyte formation. (Tr. at 109.) An x-ray of the cervical spine on November 16, 1997 showed hypertrophic changes mildly narrowing the neural foramina. (Tr. at 107.) An MRI of the cervical spine on November 14, 1997, indicated "mild degenerative change with mild broad-based disc bulging at C5-6." (Tr. at 108.) At C4-5, there was minimal bulging, at C5-6 there was hypertrophic spurring and disc bulging but no herniation, at C6-7 there was disc bulging but no herniation, and at C6-T1 there was mild hypertrophic change but no nerve root compression and the neural foramina were not compromised. (Id.) On April 22, 1999, a view of the thoracic spine indicated a "small focal right paracentral disc protrusion at T7-8 without evidence of neural compression." (Id. at 175.) A CT scan of the cervical spine on November 21, 2001 showed degenerative changes with mild narrowing of the spinal canal and mild to moderate narrowing of some neural foramina at most levels. There was slight bulging at C3-4. (Id. at 178A.) On June 11, 2002, an MRI of the thoracic spine showed multi-level degenerative disk disease. (Id. at 177.) An MRI of the cervical spine on that date indicated degenerative disk and joint disease with mild narrowing of the spinal canal and neural foramina, but no neural compression. (Id. at 178.)

A state agency medical reviewer examined the record on September 18, 2001, and concluded that plaintiff could lift 20 pounds occasionally, ten pounds frequently, could stand and/or walk for six hours in an eight hour day, could sit for six hours in a work day, and could push and/or pull to an unlimited extent. (Tr. at 138.) Plaintiff could frequently climb, balance, kneel, and crouch. He could occasionally stoop or crawl. (Id. at 139.) Plaintiff was limited in reaching overhead, and could not do repetitive fingering. (Id. at 140.) This opinion was based on chronic neck pain without radiculopathy, decreased range of motion in the neck, full range of

1 motion in the back, and limitation of movement in the wrists. (Id. at 139.)

2 The only physician to examine plaintiff in regard to his back and neck problems
3 was Dr. Kimble who had no medical records for review. This exam was also prior to the most
4 recent CT scans and MRI. Plaintiff complains that Dr. Kimble was a one time consultative
5 examiner who did not review any medical records. Generally, the undersigned views such an
6 examination with disfavor, however, more often with respect to medical areas which necessarily
7 rely on a good deal of subjective symptoms, e.g., mental health. Therefore, the lack of records in
8 this orthopedic case is not dispositive. Furthermore, the most recent films do not indicate a
9 significant change in plaintiff's condition, and do not affect the substantial evidence in the form
10 of Dr. Kimble's report. Furthermore, the ALJ considered the decreased range of motion of
11 plaintiff's neck and limited his light work to those jobs which did not require repetitive or
12 prolonged flexion of the neck. (Tr. at 22.)

13     C. <u>Whether the ALJ's Credibility Finding Was Supported by Substantial Evidence</u>

14 Plaintiff contends that the ALJ did not properly evaluate his credibility.

15 The ALJ determines whether a disability applicant is credible, and the court defers
16 to the ALJ who used the proper process and provided proper reasons. <u>See, e.g.</u>, <u>Saelee v. Chater</u>,
17 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit
18 credibility finding. <u>Albalos v. Sullivan</u>, 907 F.2d 871, 873-74 (9th Cir. 1990); <u>Rashad v.</u>
19 <u>Sullivan</u>, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be
20 supported by "a specific, cogent reason for the disbelief").

21 In evaluating whether subjective complaints are credible, the ALJ should first
22 consider objective medical evidence and then consider other factors. <u>Bunnell v. Sullivan</u>, 947
23 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible
24 \\\\\
25 \\\\\
26 \\\\\

solely because objective medical evidence does not quantify them. Id. at 345-46.[8]  If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47.  The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[9]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

In this case, the ALJ found plaintiff only partially credible for a variety of reasons. He first noted plaintiff's daily activities which included taking the bus to group meetings, some housework, visiting with friends and relatives daily, walking, birdwatching, reading, writing, and exercise, and that they were consistent with plaintiff's testimony of sitting for one hour at a time,

---

[8] This does not mean, however, that the lack of objective evidence to support the pain alleged is irrelevant to the analysis.

[9] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

walking only 20 minutes and standing 20 minutes.  They were not consistent with plaintiff's stated limitation of the need for frequent position changes or lying down for two hours a day. (Tr. at 19-20.)  Furthermore, the fact that plaintiff could read and write for periods of time were not consistent with his stated need to avoid prolonged or repetitive flexion of the neck.  (Id.)  The ALJ noted that plaintiff may experience some pain, but that it was not to the degree alleged.  ALJ also stated that plaintiff's pain medication, Tylenol with Codeine, was able to give him noticeable relief from pain.  (Id. at 20.)  Finally, plaintiff's complaints were found to be somatic in origin.  Because plaintiff was partially credible, the ALJ limited him to light work rather than any heavier work.  (Id.)

Plaintiff contends that the objective findings of record support his physical limitations and need to alternate positions; however, as explained in the previous section, the radiological findings do not support a limitation to this degree.  Although there is medical evidence of degenerative disc disease in the thoracic and cervical spine, it is not of the severity which would warrant the functional limitations proposed by plaintiff.  Furthermore, plaintiff did not come forward with any medical source to interpret those films, and the ALJ was bound to rely on Dr. Kimble's opinion.  The films and this opinion would not be expected to cause limitation to the extent asserted by plaintiff.[10]

As stated previously, Dr. Kimble specifically refused to limit plaintiff in his ability to sit, stand or walk.  (Tr. at 136.)  The only limitation consistent with plaintiff's suggested limitation is Dr. Kimble's preclusion from sustained upward or downward gazing for more than 20 minutes, based on exam indicating decreased range of motion in the neck.  The exam did not reflect decreased range of motion in other areas as proposed by plaintiff, and therefore other functional limitations are not warranted.  The limitations set forth by the state

---

[10] There is a note by Dr. Dawkins on July 13, 2000, diagnosing plaintiff with osteoarthritis in the neck and herniated disk in the low back; however, there are no objective findings to support these assessments.  (Tr. at 97.)

14

agency reviewer are also consistent with those of Dr. Kimble and support the ALJ's findings. (Tr. at 138.)

Also significant to this discussion is the sparsity of medical records indicating little treatment, let alone treatment by any specialists, implying that plaintiff's problems were not as severe as alleged. There is also no evidence that plaintiff sought physical therapy, chiropractic services, required any assistive devices or brace, or obtained surgery. In fact treatment, if any, was conservative. See Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (plaintiff's claim of extreme pain inconsistent with "minimal, conservative treatment" received). Based on the foregoing record evidence, substantial evidence supports the ALJ's credibility determination.

D. Whether the ALJ Should Have Obtained Testimony of a Vocational Expert in Determining Plaintiff's Residual Functional Capacity

Plaintiff contends that it was mandatory that the ALJ utilize a vocational expert because he could not perform his past relevant work and had nonexertional restrictions. Plaintiff's legal contention is incorrect.

The Guidelines in table form ("grids") are combinations of residual functional capacity, age, education, and work experience. At the fifth step of the sequential analysis, the grids determine if other work is available. See generally Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 577-78 (9th Cir. 1988) (Pregerson, J., concurring).

The grids may be used if a claimant has both exertional and nonexertional limitations, so long as the nonexertional limitations do not significantly impact the exertional capabilities.[11] Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other

---

[11] Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling. 20 C.F.R. § 416.969a (b) (1996); SSR 83-10, Glossary; Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989). Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (1996); SSR 83-10, Glossary; Cooper, 880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or

grounds, Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc).  The ALJ, however, is not automatically required to deviate from the grids whenever plaintiff has alleged a nonexertional limitation.  Desrosiers, 846 F.2d at 577 ("[T]he fact that a non-exertional limitation is alleged does not automatically preclude application of the grids."); 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2) (1996).  The ALJ must weigh the evidence with respect to work experience, education, and psychological and physical impairments to determine whether a nonexertional limitation significantly limits plaintiff's ability to work in a certain category.  Desrosiers 846 F.2d at 578 (Pregerson, J., concurring).  "A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines.  In such a case, the guidelines would be inapplicable."  Desrosiers, 846 F.2d at 577-78.  The ALJ is then required to use a vocational expert.  Aukland v. Massanari, 257  F.3d 1033 (9th Cir. 2001).

In this case, the ALJ concluded that plaintiff had no past relevant work within fifteen years which would qualify as substantial gainful activity.  Based on the grids (Medical-Vocational Rule 202.21) and plaintiff's capacity to do a restricted range of light work (with no repetitive or prolonged flexion of the neck for gazing), the ALJ found that plaintiff was not disabled because this limitation did not significantly erode the occupational base for light work. (Tr. at 21.)  The ALJ named a significant number of jobs plaintiff could do, including school bus monitor, host or barker.  (Tr. at 22.)

Plaintiff claims that he had additional limitations which were not acknowledged by the ALJ in his vocational analysis.  He contends the ALJ should have considered his severe mental limitations, his limited manual dexterity due to bilateral carpal tunnel syndrome, and his need to alternate positions frequently.  The first and last limitations have already been addressed and discounted *supra*.  For example, contrary to plaintiff's claim that he cannot perform the jobs suggested by the ALJ because his bipolar disorder has caused him to be charged with domestic

---

her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

violence and assault on a police officer with a knife, Dr. Vander Veer concluded that plaintiff could relate appropriately to coworkers and supervisors. (Id. at 117.)

In regard to plaintiff's carpel tunnel syndrome, the ALJ found that plaintiff's carpal tunnel surgery on October 25, 2001 and February 1, 2002 was successful, with no symptoms on April 10, 2002. (Tr. at 17.) Therefore, the ALJ concluded that his symptoms did not last a continuous twelve months and this impairment was not severe.[12] (Id.) The records bear out this conclusion. (Tr. at 207.) Plaintiff did not seek further treatment for this problem after April, 2002. Contrary to plaintiff's assertion, plaintiff was not referred to UCD Medical Center at that time for his carpal tunnel syndrome, but for evaluation of his cervical spine MRI. (Id.) Plaintiff's Mtn. at 12.

As aptly pointed out by defendant, Social Security Ruling 83-14 advises that a vocational resource rather than a vocational consultant is appropriate in obvious cases with relatively simple issues. (Id. at *3.) In this case, the only nonexertional limitation is the limit on neck flexion. Based on one job mentioned by the ALJ and as described in the Dictionary of Occupational Titles, § 342.657-010, the job of barker does not require repetitive or prolonged flexion of the neck. Defendant's Oppo., Attachment. The United States Dept. of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy." Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements. It is used by the SSA to classify jobs as skilled, unskilled, or semiskilled. (Id.) Each job is assigned a number reflecting how long it generally takes to learn the job,

---

[12] Plaintiff argues that his signs and symptoms of carpal tunnel syndrome began in July, 2000, and therefore lasted more than twelve months. The question, however, is whether plaintiff was disabled during that time period, and the record indicates that he was not. See Tr. at 97 (as of July 13, 2000, plaintiff complained of pain and tingling in hands which has been getting worse, for three or four months).

termed "specific vocational preparation" ("SVP") time.  (Id.)  The DOT is a primary source of reliable job information for the Commissioner.  20 C.F.R. § 404.1566(d)(1).  The job of school bus monitor also does not require prolonged neck flexion.  Id. at § 372.667-042.

Only if the occupational base is significantly eroded, such as where a plaintiff is completely unable to perform a nonexertional activity such as crouching, would a vocational consultant be necessary.  Iannopollo v. Barnhart, 280 F. Supp.2d 41, 50 (W.D. N.Y. 2003). Based on the one limitation supported by the record and found by the ALJ, it was appropriate to refer to the grids rather than consult a vocational expert.

CONCLUSION

ACCORDINGLY, plaintiff's Motion for Summary Judgment or Remand is DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter Judgment for the Commissioner.

DATED: 9/22/05

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
neff0829.ss